United States Court of Appeals,

Eleventh Circuit.

No. 95-8533.

August GONZALES, as Administrator of the Estate of Timothy Bourgeois, deceased, Plaintiff-Appellant,

v.

GARNER FOOD SERVICES, INC.; Willis Corroon Administrative Services Corporation; Willis Corroon Corporation of Georgia, Defendants,

Garner Fast Foods, Inc., Defendant-Appellee,

American Association of Retired Persons (AARP); Equal Employment Opportunity Commission (EEOC); American Medical Association, American Public Health Association, American Foundation for AIDS Research, Gay Men's Health Crisis; American Civil Liberties Union, the ARC, Gay and Lesbian Advocates and Defenders, Inc., National Alliance for the Mentally Ill, National Association of People With AIDS, National Association of Protection and Advocacy Systems, National Minority AIDS Council, Equal Employment Advisory Council, Amici Curiae.

Aug. 2, 1996.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:93-CV-1639-JOF), J. Owen Forrester, Judge.

Before ANDERSON and BLACK, Circuit Judges, and HENDERSON, Senior Circuit Judge.

BLACK, Circuit Judge:

Appellant August Gonzales filed this action under Title I of the Americans With Disabilities Act of 1990 (ADA),[1] alleging that Defendants discriminated against a former employee, Timothy Bourgeois, by imposing a cap for AIDS-related treatment on health insurance benefit coverage Bourgeois elected to continue following

---

[1] 42 U.S.C. § 12101 *et seq.* (1994). Appellant initially sought relief under both § 510 of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1140 (1994), and the ADA, but subsequently dismissed the ERISA claim.

his termination. The district court granted a motion to dismiss jointly filed by Garner Fast Foods, Inc. (GFF) and Garner Food Services, Inc. (GFS). Thereafter, Appellant dismissed claims against all Defendants other than GFF and moved for reconsideration of the order of dismissal. This motion was denied, and Appellant appeals. We affirm.

## I. BACKGROUND[2]

Bourgeois was employed at a Hardee's restaurant, owned and operated by GFS. GFS sponsored and administered a group welfare benefit plan which provided health insurance coverage up to a $1 million lifetime limit. Bourgeois participated in the health insurance benefit plan through his employment.

Bourgeois was diagnosed with AIDS in February 1991, and GFS learned of his condition when he submitted health insurance claims for medical treatment. GFS discharged him in April 1991 to avoid paying future health insurance claims. Following his termination, Bourgeois paid the necessary premiums to continue his health insurance benefit coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA).[3]

At least partly because of Bourgeois' continued participation in the health insurance benefit plan after his discharge, GFS

---

[2]Since the district court decided this case on a motion to dismiss, we have taken the allegations in Appellant's complaint as true and have construed them liberally in favor of Appellant. *See Walker Process Equip., Inc. v. Food Mach. and Chem. Corp.,* 382 U.S. 172, 174-75, 86 S.Ct. 347, 349, 15 L.Ed.2d 247 (1965).

[3]29 U.S.C. § 1161 *et seq.* (1994). COBRA amended ERISA to require each employer to allow former employees to elect to continue coverage under the employer's group health insurance plan for up to 18 months following termination of employment. *Id.*

amended the plan on October 1, 1991, to cap AIDS-related treatment to $10,000 annually with a lifetime maximum limit of $40,000. GFS ceased operations on March 31, 1992. Thereafter, GFF continued GFS' operations, and became the sponsor of Bourgeois' plan.[4] Before he died on September 6, 1992, Bourgeois had exhausted the benefits available to him under the AIDS cap limit and was denied payment for claims submitted in excess, totaling approximately $90,000.

## II. STANDARD OF REVIEW

The district court's denial of Appellant's motion for reconsideration is reviewed for abuse of discretion. *See Region 8 Forest Serv. Timber Purchasers Council v. Alcock,* 993 F.2d 800, 806 (11th Cir.1993), *cert. denied,* --- U.S. ----, 114 S.Ct. 683, 126 L.Ed.2d 651 (1994). Since our review requires us to focus on conclusions of law made by the district court in granting the motion to dismiss, we review these questions of law *de novo. See O'Reilly v. Ceuleers,* 912 F.2d 1383, 1385 (11th Cir.1990).

## III. DISCUSSION

The ADA was enacted on July 26, 1990, but did not become

---

[4]At the outset, GFF denies liability on the bases that Bourgeois worked only for GFS and not GFF and never sought employment from GFF. Citing this Court's decision in *Bud Antle, Inc. v. Eastern Foods, Inc.,* 758 F.2d 1451 (11th Cir.1985), Appellant counters that GFF is liable under theories of *de facto* merger and mere continuation because GFF took over the operations of the defunct GFS with identical officers, directors, and virtually an identical sole shareholder, maintained the same health plan and AIDS cap first implemented by GFS, and assumed all liabilities of GFS. We decline to resolve this issue. Given our holding that Appellant is not entitled to relief under the ADA, GFF is not liable even if it is a successor in interest to GFS.

effective until July 26, 1992.[5]  Pub.L. No. 101-336, § 108, 104 Stat. 327, 337 (1990).  Title I of the ADA addresses disability discrimination by employers.[6]  As applied to private employers, Title I is not retroactive.  *See O'Bryant v. City of Midland,* 9 F.3d 421, 422 (5th Cir.1993);  *see also* 1990 U.S.C.C.A.N. 601 (statement by President George Bush upon signing S. 933).  Against this background, courts have concluded that Title I applies only to wrongful acts committed after the effective date of the ADA.  *See, e.g., O'Bryant,* 9 F.3d at 422.  Since the AIDS cap was implemented in October 1991, prior to the effective date of the ADA, GFF argues from the outset that Appellant's claim is barred.

Appellant counters that his claim is actionable on the basis that the AIDS cap "endured" after the effective date of the ADA, thereby making GFF's refusal to pay health benefits from then until Bourgeois' death a continuing violation of the Act.  In determining whether maintenance of the AIDS cap after July 26, 1992, constituted a continuing violation of the ADA, this Court must distinguish between the present consequences of a one-time violation, which would not qualify as a continuing violation, and the continuation of the violation into the present, which would. *See Beavers v. American Cast Iron Pipe Co.,* 975 F.2d 792, 796 (11th Cir.1992).  As did the district court, we will assume for purposes

---

[5]The dissent refers to the two year span between the enactment and effective dates as a "phase-in period," the purpose of which was "to give employers time to take those actions necessary to come into compliance with the requirements of the Act";  however, the dissent cites no authority indicating this was Congress' intent.

[6]It is undisputed that GFS met the ADA definition of "employer."  *See* 42 U.S.C. § 12111(5)(A).

of our analysis that the denial of AIDS-related health care benefits after the effective date of the ADA could constitute a continuing violation of the Act. *See Bazemore v. Friday,* 478 U.S. 385, 395, 106 S.Ct. 3000, 3006, 92 L.Ed.2d 315 (1986) ("A pattern or practice that would have constituted a violation of Title VII, but for the fact that the statute had not yet become effective, became a violation upon Title VII's effective date."); *Beavers,* 975 F.2d at 797-98 (holding that the continued maintenance of a pre-Title VII discriminatory benefits policy is actionable after the effective date of Title VII as a continuing violation of the statute).

GFF argues that even if maintaining the AIDS cap beyond the effective date of the ADA could constitute a continuing violation, Appellant fails to state a prima facie case of discrimination under Title I of the Act. The Title I general rule states: "No covered entity shall discriminate against a *qualified individual with a disability* because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (emphasis supplied). A "qualified individual with a disability" (QID) is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of *the employment position that such individual holds or desires*...."[7] *Id.* § 12111(8) (emphasis supplied).

---

[7]Thus, § 12112(a) does not utilize the term "individual" in a broad manner, as suggested by the dissent, but rather within a specific term of art—"qualified individual with a

The parties do not dispute that AIDS is a disability recognized under the ADA.[8] It is further undisputed that fringe benefits, such as employer-provided health benefits, are one set of the "terms, conditions, and privileges of employment" protected from unlawful discrimination under the ADA.[9] Thus, Appellant reasons, once Bourgeois took advantage of the opportunity to participate in the group health insurance plan, he was entitled to be provided with health insurance in a nondiscriminatory manner.

Bourgeois does not satisfy the QID requirement under the plain language of the ADA, however, because he neither held nor desired to hold a position with GFF at or subsequent to the time the alleged discriminatory conduct was committed. Rather, Bourgeois was a participant in the health benefit plan only by virtue of his status as a former employee. Appellant does not contest this conclusion, but argues that since the fruits of many fringe benefits are realized during the post-employment period, Congress must have intended former employees to be protected under

disability"—explicitly defined in § 12111(8).

[8]*See* 28 C.F.R. §§ 35.104 (defining "disability" to include HIV disease at (1)(ii)), 36.104 (same at (1)(iii)) (1995).

[9]This is clear from the statute, *see, e.g.,* 42 U.S.C. §§ 12101(a)(5), 12112(a), (b)(2), (b)(4), the legislative history, *see* H.R.Rep. No. 485(II), 101st Cong., 2d Sess. 59 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 341 ("[E]mployers may not deny health insurance coverage completely to an individual based on the person's diagnosis or disability."); H.R.Rep. No. 485(II), 101st Cong., 2d Sess. 71 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 494, and the interpretive regulations, *see, e.g.,* 29 C.F.R. § 1630.4(f) (it is unlawful for an employer to discriminate on the basis of disability in the provision of "[f]ringe benefits available by virtue of employment"); 56 Fed.Reg. 35726, 35746 (July 26, 1991) (EEOC Interpretative Guidance on 29 C.F.R. §§ 1630.4, 1630.5).

the ADA as well.

Neither the QID definition nor the ADA's definitions of "employee" and "discriminate" provide support for Appellant's position. The ADA defines "employee" as "an individual *employed by an employer.*"[10]   *Id.* § 12111(4) (emphasis supplied).  Further, § 12112(b) provides:

> As used in subsection (a) of this section, the term "discriminate" includes—
>
> (1) limiting, segregating, or classifying a *job applicant or employee* in a way that adversely affects the opportunities or status of such *applicant or employee* because of the disability of such *applicant or employee;*
>
> (2) participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's *qualified applicant or employee* with a disability to the discrimination prohibited by this subchapter ...;
>
> ....
>
> (5)(A) not making reasonable accommodations to the known physical or mental limitations of an *otherwise qualified individual with a disability who is an applicant or employee* ... or
>
> (B) denying employment opportunities to a *job applicant or employee* who is an *otherwise qualified individual with a disability* ...;
>
> (6) using *qualification standards, employment tests or other selection criteria* that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity.[11]

---

[10]This definition directly rebuts the suggestion of the dissent that "nothing in the plain meaning of [the] term ["employee'] limits its scope to current employees as opposed to former employees."

[11]Although the dissent maintains § 12112(b)(6) does not specifically "refer to employees or applicants," the plain language of the provision contemplates discrimination encountered solely by job applicants and current employees.

*Id.* § 12112(b) (emphases supplied).

Moreover, the legislative history of the ADA specifically states that the purpose of including the phrase "essential functions" within the QID definition is to "ensure that employers can continue to require that all *applicants and employees,* including those with disabilities, are able to perform the essential, i.e., the non-marginal functions of the job in quesiton [sic]." H.R.Rep. No. 485(II), 101st Cong., 2d Sess. 55 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 337 (emphasis supplied). Thus, a review of both the ADA and its legislative history suggests that Congress intended to limit the protection of Title I to either employees performing, or job applicants who apply and can perform, the essential functions of available jobs which their employers maintain.

Appellant argues against such a conclusion on the basis that other legislative history of the ADA, as well as Equal Employment Opportunity Commission (EEOC) interpretive guidance, suggest that courts should construe the ADA by analogy to Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.* (1994). As does the general rule of Title I of the ADA, the general rule of Title VII prohibits discrimination with respect to the "terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a). Further, the Supreme Court found that health insurance coverage made pursuant to an employment relationship is a term, condition, or privilege of employment as defined under the Title VII general rule. *Newport News Shipbuilding and Dry Dock Co. v. EEOC,* 462 U.S. 669, 682, 103 S.Ct. 2622, 2630, 77 L.Ed.2d 89 (1983).

With respect to employment-related terms, legislative history of the ADA states that the provisions in Title I use or incorporate by reference several of the definitions in Title VII, including the term "employee." H.R.Rep. No. 485(II), 101st Cong., 2d Sess. 54, *reprinted in* 1990 U.S.C.C.A.N. 303, 336. The EEOC has observed that the definitions in Title I "are identical, or almost identical" to those found in Title VII and should be given the same meaning. 56 Fed.Reg. 35726, 35740 (July 26, 1991) (EEOC Interpretive Guidance on 29 C.F.R. § 1630.2(a)-(f)). The EEOC has further stated that but for a Title VII exception for public officials not found in the ADA, "the term "employee' has the same meaning [under the ADA] that it is given under Title VII." *Id.*

Against this background, Appellant points to the Title VII retaliation statute, contending that although the statute on its face only protects "employees" and "applicants for employment" from illegal retaliation, 42 U.S.C. § 2000e-3, courts have broadened the class of protected persons under the statute to include former employees. Indeed, in construing the retaliation statute, this Court reasoned:

> While it is true that the language of a statute should be interpreted according to its ordinary, contemporary and common meaning ... this plain-meaning rule should not be applied to produce a result which is actually inconsistent with the policies underlying the statute. In the instant case, a strict and narrow interpretation of the word "employee" to exclude former employees would undercut the obvious remedial purposes of Title VII.

*Bailey v. USX Corp.,* 850 F.2d 1506, 1509 (11th Cir.1988) (citation omitted).

In further support of his argument, Appellant relies on *EEOC v. Cosmair, Inc., L'Oreal Hair Care Div.,* 821 F.2d 1085 (5th

Cir.1987), an anti-retaliation case involving the receipt of post-employment fringe benefits. In *Cosmair,* the Fifth Circuit expanded the meaning of the term "employee" to include former employees so long as the disability-based discrimination is related to or arises out of the employment relationship. 821 F.2d at 1088. The statute at issue in *Cosmair* was the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 *et seq.* (1994); *Bailey* was a Title VII case. Since this Court in *Bailey* cited *Cosmair, see Bailey,* 850 F.2d at 1509, however, Appellant contends that former employees suing in this Circuit for retaliation affecting post-employment fringe benefits have a cause of action under Title VII, and by analogy, Title I of the ADA. Thus, Appellant reasons, because Bourgeois' participation in the health benefit plan arose out of his employment, and the refusal to pay benefits arguably constituted a continuing violation into the effective period of the ADA, he is entitled to recover damages for discrimination suffered by Bourgeois after the effective date of the ADA.

Finally, Appellant cites *EEOC v. South Dakota Wheat Growers Ass'n,* 683 F.Supp. 1302 (D.S.D.1988), in which the issue considered was whether Title VII governed a health insurance policy "provided after termination of employment, as a consequence of such employment." 683 F.Supp. at 1304. In deciding that question in the affirmative, the district court found that "discrimination arising out of the employment relationship is unlawful regardless of "whether or not the person discriminated against is an employee at the time of [the] discriminatory conduct.' " *Id.* (quoting

*Pantchenko v. C.B. Dolge Co., Inc.,* 581 F.2d 1052, 1055 (2d Cir.1978)). The court concluded that it was unlawful for an employer to discriminate against a former employee in the provision of post-employment health insurance coverage. *Id.* at 1304-05.

Based upon the foregoing, Appellant argues this Court should look to Title VII in seeking to understand ADA employment terms and conclude that former employees are included within the scope of ADA protection. We disagree. The cardinal rule of statutory construction is that the language of a statute should be interpreted in accordance with its ordinary, contemporary, and common meaning. *Bailey,* 850 F.2d at 1509. Although we may resort to the EEOC's interpretive guidelines for assistance in our analysis, they are not controlling upon this Court. *See Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). Absent clearly expressed legislative intent to the contrary, the plain language of the statute should be conclusive. *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). In adhering to the cardinal rule, we find the plain language of the ADA clearly demonstrates the intent of Congress to limit the scope of the Act to only job applicants and current employees capable of performing essential functions of available jobs. We find no clearly expressed legislative intent suggesting that former employees such as Bourgeois should be covered under the Act as well.[12]

---

[12]Citing no authority, the dissent contends "[i]t would be counter-intuitive, and quite surprising, to suppose (as the majority nevertheless does) that Congress intended to protected

Appellant cites no binding authority demonstrating that the ADA protects former employees. And, with two exceptions, the only cases cited by Appellant discussing former employees' rights to sue their former employers involve claims which arose under explicit anti-retaliation provisions contained in Title VII and the ADEA.[13] These retaliation cases are easily distinguishable.

This Court in *Bailey* cautioned that courts should avoid a literal interpretation of a statute when such an approach would frustrate the statute's central purpose. *Bailey,* 850 F.2d at 1509. There is no such risk in this case. As this Court in *Bailey* recognized, the expansion of the term "employee" to confer standing to sue upon former employees claiming retaliation is necessary to provide meaning to anti-retaliation statutory provisions and

---

[sic] current employees' fringe benefits, but intended to then abruptly terminate that protection upon retirement or termination, at precisely the time that those benefits are designed to materialize." Since we find no clearly expressed legislative intent of Congress to suggest that former employees should be included within the scope of ADA protection, we respectfully disagree.

[13]Thus, contrary to the dissent's broad assertion that "[w]hen Congress enacted the ADA in 1990, it was clearly established [in] Title VII case law that the term "employee' includes former employees," the overwhelming majority of Title VII cases which have so found have been in the retaliatory context. The only exceptions cited by Appellant are *Wheat Growers,* 683 F.Supp. at 1302, a Title VII case not binding upon this Court, and *Northern v. City of Chicago,* 841 F.Supp. 234 (N.D.Ill.1993). In *Northen,* former Chicago police officers receiving disability pensions sued the city over its decision to require the retirees to pay for health insurance. 841 F.Supp. at 235. In denying the city's motion to dismiss, the district court held that "[a]t the initial pleading stage it is too early to conclude that retirees are not covered employees under the ADA." *Id.* at 236. We are not bound by *Northen,* and the decision is not persuasive in that the court dismissed the case without ever addressing whether the retirees were in fact QIDs under the ADA.

effectuate congressional intent.[14]  *Id.*  There are, however, no allegations of retaliation in this case, and excluding former employees from protection under the Act is not inconsistent with the policies underlying the statute.  To the contrary, interpreting the ADA to allow any disabled former employee to sue a former employer essentially renders the QID requirement under the Act, that an individual with a disability *hold or desire* a position the essential functions of which he or she can perform, meaningless.

In the alternative, Appellant attempts to redefine the QID requirement by reference to § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1994).  Appellant correctly notes that decisions interpreting the Rehabilitation Act, the ADA's statutory

----

[14]Again with no support, the dissent counters:

> The anti-retaliation provision would have ample scope without claims by former employees.  For example, current employees often sue for retaliation when subjected to discrimination because of having filed an EEOC complaint.  It is no more necessary with respect to Title VII retaliation than it is here to include former employees in order to "provide meaning' to the statute.

While we recognize that retaliation claims may be filed by current employees, we disagree with the dissent's conclusion that "[t]he anti-retaliation provision would have ample scope without claims by former employees."  To the contrary, we note that many retaliation claims are filed by former employees alleging, for example, post-employment blacklisting.  *See, e.g., Bailey,* 850 F.2d at 1507 (alleging that former employer gave unfavorable reference to prospective employer in retaliation for former employee's having filed sex discrimination suit);  *Pantchenko,* 581 F.2d at 1054 (alleging that former employer refused to furnish letters of recommendation in retaliation for former employee's having filed discrimination charges with EEOC); *Rutherford v. American Bank of Commerce,* 565 F.2d 1162, 1163-64 (10th Cir.1977) (alleging that in retaliation for filing sex discrimination charge against former employer, it advised prospective employer of charge).

predecessor, are relevant precedent in interpreting the provisions of the ADA. H.R.Rep. No. 485(II), 101st Cong., 2d Sess. 23 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 304. Under § 504, no "otherwise qualified handicapped individual" may be discriminated against under any federally funded activity or program. 29 U.S.C. § 794. As the phrase "otherwise qualified handicapped individual" is not defined in the Rehabilitation Act, the Supreme Court attempted to do so in *Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979). In *Davis,* the Supreme Court considered a claim of a licensed practical nurse who was denied admission to a college's nursing program because of a hearing disability. 442 U.S. at 402, 99 S.Ct. at 2365. In its analysis, the Supreme Court determined that "[a]n otherwise qualified person [under § 504] is one who is able to meet all of a program's requirements in spite of his handicap." *Id.* at 406, 99 S.Ct. at 2367. Finding plaintiff unable to do so, the Supreme Court denied relief. *Id.* at 414, 99 S.Ct. at 2371.

In an effort to shoehorn Bourgeois into the Supreme Court's definition of "otherwise qualified person" in *Davis,* Appellant and the EEOC attempt to analogize the nursing "program's requirements" in *Davis* with the "requirements" Bourgeois needed to fulfill to participate in the health benefits "program" following his termination. By analogy to § 504, they contend that for Bourgeois to be considered "qualified" under Title I of the ADA, he need not have been a current employee or job applicant "qualified" to perform essential functions of an available job; instead, citing *Davis,* they argue he need only have been "qualified" to meet the

"requirements" of the health benefits plan.[15]

While comparing the qualifications necessary for admission to the nursing program in *Davis* to those required for Bourgeois to receive health benefits is like comparing applies to oranges, Appellant draws support for his argument from *Modderno v. King,* 871 F.Supp. 40 (D.D.C.1994), *aff'd,* 82 F.3d 1059 (D.C.Cir.1996). In *Modderno,* plaintiff brought suit alleging discrimination on the basis of her disability in violation of § 504. 871 F.Supp. at 41. The district court determined that "[t]o establish a prima facie case under § 504, a person must be handicapped under the Act, *otherwise qualified to receive or participate in the federally supported benefit or program,* and excluded from the benefit solely by reason of her or his handicap." *Id.* at 42 (citing *Pesterfield v. Tennessee Valley Auth.,* 941 F.2d 437, 441 (6th Cir.1991)) (emphasis supplied). Although the district court ultimately granted defendant's motion to dismiss upon finding that plaintiff was not denied benefits solely by reason of her handicap, *id.* at 42-43, Appellant argues this Court should nevertheless find *Modderno* instructive in giving meaning to the phrase "otherwise qualified handicapped individual" under the Rehabilitation Act.

---

[15]Consistent with this argument, the dissent maintains that a former employee seeking fringe benefits may satisfy the QID definition merely by performing such essential functions as "mak[ing] the appropriate election, pay[ing] the premiums, etc." This position completely ignores the legislative history of the ADA discussed herein, which states that the purpose of including the phrase "essential functions" within the QID definition is to "ensure that employers can continue to require that all *applicants and employees,* including those with disabilities, are able to perform the essential, i.e., the non-marginal functions of the *job* in quesiton [sic]." H.R.Rep. No. 485(II), 101st Cong., 2d Sess. 55 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 337 (emphases supplied).

We decline this invitation. The *Modderno* decision is not binding in this Circuit, and we disagree with the court's holding. What Appellant, the EEOC and the *Modderno* court have done is manipulate the Supreme Court's decision in *Davis* interpreting the phrase "otherwise qualified handicapped individual" under § 504 to essentially create a new job category: a "post-employment benefits recipient." The Eighth Circuit appropriately rejected such an argument in *Beauford v. Father Flanagan's Boys' Home,* 831 F.2d 768 (8th Cir.1987), *cert. denied,* 485 U.S. 938, 108 S.Ct. 1116, 99 L.Ed.2d 277 (1988). In *Beauford,* plaintiff was unable to perform the essential functions of any available job the employer maintained but claimed she was still protected under § 504 because she was handicapped and eligible for fringe benefits. 831 F.2d at 771-72. In its analysis, the Eighth Circuit considered both the Supreme Court's decision in *Davis,* as well as the federal regulations which define a "qualified handicapped person" under the Rehabilitation Act as the following:

> (1) With respect to employment, a handicapped person who, with reasonable accommodation, can perform the essential functions of the job in question;
>
> ....
>
> (4) With respect to other services, a handicapped person who meets the essential eligibility requirements for the receipt of such services.

45 C.F.R. § 84.3(k).

The Eighth Circuit ruled out subheading (4), upon which plaintiff relied, determining the provision does not apply to discrimination with respect to employee benefits, but rather to discrimination by health, welfare and social services providers

toward applicants attempting to obtain such services. *Beauford,* 831 F.2d at 771-72. Finding subheading (1) to be the proper category governing plaintiff's claim, the court concluded that "both the language of the statute and its interpretation by the Supreme Court [in *Davis* ] indicate that section 504 was designed to prohibit discrimination within the ambit of an *employment relationship in which the employee is potentially able to do the job in question.*" *Id.* at 771 (emphasis supplied).

We are persuaded by the reasoning of the Eighth Circuit in *Beauford,* finding it consistent with congressional intent underlying Title I of the ADA. Since Bourgeois was neither a job applicant nor a current employee capable of performing essential functions of an available job with GFF at or subsequent to the time the alleged discriminatory conduct was committed,[16] he was not a QID within the meaning of the ADA. Thus, Appellant is not entitled to relief.[17]

### IV. CONCLUSION

We conclude that Bourgeois, a former employee, was not a

---

[16]Arguing that Bourgeois was employed at a competing fast food restaurant until shortly before his death, Appellant urges this Court to remand the case for development of the record as to Bourgeois' ability to perform the "essential functions" of his job. We decline to do so. While Bourgeois may indeed have been able to perform the essential functions of a job, including the job he held while previously employed by GFS, he was neither a current employee of nor a job applicant with GFF at or subsequent to the time the alleged discriminatory conduct was committed. Accordingly, we find Bourgeois was not covered under Title I of the ADA.

[17]This opinion should not be read to infer that a former employee has no recourse in the event an employer makes a substantial change in a health insurance benefit plan following discharge. There is simply no cause of action under the ADA.

"qualified individual with a disability" as defined under the ADA and therefore not entitled to the Act's protection. The district court appropriately denied Appellant's motion for reconsideration of the order of dismissal.

AFFIRMED.

ANDERSON, Circuit Judge, dissenting:

The majority today concludes that Timothy Bourgeois was not a "qualified individual with a disability" under the Americans with Disabilities Act ("ADA" or "the Act"), solely because Bourgeois was a former employee. I respectfully disagree with the majority's conclusion that the ADA provides protection only for currently active employees.

At the outset, it is important to clarify the conduct of the defendant-appellee, Garner Fast Foods, Inc. ("GFF"). The majority correctly notes that GFF discharged Bourgeois in April of 1991 "to avoid paying future health insurance claims" for him. At 2972. The majority fails to mention that GFF took this action, which would clearly be unlawful now that the ADA is in effect, during the two year phase-in that Congress included in the Act, which ran from July 26, 1990, until the July 26, 1992, effective date. The purpose of this phase-in period was to give employers time to take those actions necessary to come into compliance with the requirements of the Act. Instead of taking action to come into compliance with the ADA, GFF fired Bourgeois and then, because of Bourgeois' continued participation in the company health insurance benefit plan, GFF amended that plan to impose an AIDS cap, all shortly before the July 26, 1992, effective date of ADA.

Bourgeois seeks to recover reimbursement only for medical expenses incurred from and after the July 26, 1992, effective date of the Act; he does not seek to retroactively recover expenses incurred before that date. In a case in an almost identical posture, this Court held that the continuation of an allegedly discriminatory health insurance policy constitutes a continuing violation, an "ongoing policy actively maintained by" the employer such that "each week in which divorced men are denied insurance coverage ... constitutes a wrong." *Beavers v. American Cast Iron Pipe Co.,* 975 F.2d 792, 798 (11th Cir.1992); *see also Bazemore v. Friday,* 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986).[1]

The majority acknowledges that AIDS is a disability under the ADA. They also recognize that fringe benefits like employer-provided health benefits are among the "terms, conditions, and privileges of employment" protected by the Act. At 2974 & nn. 6-7. Thus, employer-provided fringe benefits are subject to the anti-discrimination provisions of the ADA. This far, I agree with the majority. However, the majority then concludes that Bourgeois lost all protection under the ADA when he was fired, thereby assuming the status of a former employee. The crux of the majority's position is that the statutory term "employee" includes only currently active employees, and that the statutory term "qualified individual with a disability" does not include a retired employee or other former employee because such persons can no longer perform the essential functions of the positions which they

_____

[1]The majority assumes that the violation alleged here is a continuing violation. At 2973. As noted, this result is dictated by binding precedent.

formerly held.  For the reasons that follow, I dissent.

Unlike the majority, I cannot conclude that the plain meaning of the language of the statute limits the Act's protection to currently active employees or job applicants, and excludes retirees and other former employees.  Quite the contrary, the governing language of the general statutory provision uses the broader term "individual":

> No covered entity shall discriminate against a qualified *individual* with a disability because of the disability of such *individual* in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, *and other terms, conditions, and privileges of employment.*

42 U.S.C. § 12112(a).[2]  Moreover, even if the governing general provision had used the term "employee," rather than the term "individual," nothing in the plain meaning of that term limits its scope to current employees as opposed to former employees;  this is borne out by the case law discussed below.

Finding no conclusive answer in the plain meaning of the statutory language, I turn for guidance to the structure and evident purpose of the statute, the legislative history, the case law, and the guidance provided by the administrative agency charged with enforcing the statute.  The purpose of the statute is expressly stated in the broadest possible terms:

---

[2]The majority emphasizes the language of § 12112(b) which sets out a *nonexclusive* list of actions (or types of action) which constitute discrimination.  At 2975.  The majority takes comfort in the fact that many of the actions described refer to employees or applicants.  Not only is this list expressly *nonexclusive,* but the focus of the subsection is on the description of actions that constitute discrimination, not on the persons protected by the Act.  In any event, not all of the descriptions refer to employees or applicants.  *See* § 12112(b)(4) & (6).

It is the purpose of this chapter ... to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.

42 U.S.C. § 12101(b)(1). In addition to its broad purpose, the statute is clearly a remedial one. The law is well established that remedial statutes are to be construed liberally so as to promote the remedial purposes of the statute. *Pullman-Standard v. Swint,* 456 U.S. 273, 275, 102 S.Ct. 1781, 1783, 72 L.Ed.2d 66 (1982) (Title VII); *Corning Glass Works v. Brennan,* 417 U.S. 188, 208, 94 S.Ct. 2223, 2234-35, 41 L.Ed.2d 1 (1974) (Equal Pay Act); *Terrell v. U.S. Pipe & Foundry Co.,* 644 F.2d 1112, 1123 (5th Cir. Unit B 1981) (Civil Rights Act of 1964), *rev'd on other grounds sub nom. Int'l Assoc. of Machinists and Aerospace Workers, AFL-CIO v. Terrell,* 456 U.S. 955, 102 S.Ct. 2028, 72 L.Ed.2d 479 (1982).

Keeping in mind this mandate to liberally construe remedial statutes, I turn to one aspect of the structure of the Act. The majority acknowledges that the protection of the Act extends to fringe benefits provided by employers, such as pension and profit-sharing plans and health benefit plans.[3] It is a matter of common knowledge that fringe benefit plans routinely and commonly cover retirees and other former employees. Indeed, pension and profit-sharing plans are designed primarily for the post-employment years. It is entirely reasonable to infer that Congress intended the Act's protection to extend to those individuals routinely and

---

[3]Section 12112(a) expressly extends protection to "other terms, conditions, and privileges of employment." The statute also makes several other references indicating that fringe benefits are protected. *See* § 12112(b)(2) & (4). The majority concedes that it is clear that fringe benefits are protected by the ADA, citing the statute, its legislative history, and the interpretive regulations. At 2974 & n. 7.

commonly included within such fringe benefit plans.  It would be counter-intuitive, and quite surprising, to suppose (as the majority nevertheless does) that Congress intended to protect current employees' fringe benefits, but intended to then abruptly terminate that protection upon retirement or termination, at precisely the time that those benefits are designed to materialize. The structure of the statute, in clearly extending protection to fringe benefit plans, indicates that Congress intended protection for those routinely and commonly covered by such employer-provided plans.

The structure of the Act, its legislative history and the interpretive regulations also establish that Congress intended for the ADA to be construed in a manner similar to Title VII.  The text of the ADA expressly incorporates the "powers, remedies and procedures set forth in Title VII".  42 U.S.C. § 12117(a).  Also, much of the language in the ADA mirrors language found in Title VII.  For example, both define the term "employee" to mean "an individual employed by an employer."  The House of Representatives Education and Labor Committee wrote:

> Several of the definitions set out in title VII of the Civil Rights Act of 1964 are adopted or are incorporated by reference in this legislation—i.e., ... employer, person ... the term "employee" means an individual employed by an employer.

H.R.Rep. No. 485(II), 101st Cong., 2d Sess. 54, *reprinted in* 1990 U.S.C.C.A.N. 336.

> The provisions in title I of this bill use or incorporate by reference many of the definitions in title VII of the Civil Rights Act of 1964 (*employee,* employer ...).

*Id.* at 149, *reprinted in* 1990 U.S.C.C.A.N. 432

> [T]itle I of this legislation incorporates by reference the definition of the term "employer" and "employee" used in title VII of the Civil Rights Act of 1964....

*Id.* at 76, *reprinted in* 1990 U.S.C.C.A.N. 359; *see also McDermott International, Inc. v. Wilander,* 498 U.S. 337, 342, 111 S.Ct. 807, 811, 112 L.Ed.2d 866 (1991) ("In the absence of a contrary indication, we assume that when a statute uses [a term of art], Congress intended it to have its established meaning.").

The EEOC interpretive guidelines also support this view. They state that, "[i]n general, the term "employee' has the same meaning that it is given under Title VII." 29 CFR § 1630.2(a)-(f).[4] Those guidelines note that there are several definitions in Title I of the ADA that are identical, or almost identical, to ones found in Title VII, and that, "[t]hese terms are to be given the same meaning under the ADA that they are given under Title VII." *Id.*

Based on the similarities between the texts and remedial purposes of the ADA and Title VII, as well as the evidence of congressional intent, courts interpreting the ADA look to Title VII. *See e.g. Carparts Distri. Ctr. v. Automotive Wholesaler's Assoc.,* 37 F.3d 12, 16 (1st Cir.1994) ("In making our determination we look for guidance to the Civil Rights Act of 1964 ... and cases interpreting that statute."); *West v. Russell Corp.,* 868 F.Supp. 313, 317 (M.D.Ala.1994) (holding that the court will analyze claims of discrimination under the ADA as it would claims under Title VII). This Court should follow this common-sense approach and do

---

[4]EEOC guidelines, "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986).

so as well.

This Court has construed the term "employee" in the Title VII context to effectuate Congress' purposes in enacting that legislation. In *Bailey v. USX Corp.,* 850 F.2d 1506 (11th Cir.1988), we held that a former employee had the right to sue his former employer for retaliation under Title VII, despite the language of the statute which referred only to "employees" and "applicants for employment." *Id.* at 1509. We noted that "every other court" had thus held, based upon "a common sense reading in keeping with the purpose of the statute." *Id.; see also Charlton v. Paramus Bd. of Educ.,* 25 F.3d 194 (3rd Cir.1994), *cert. denied,* --- U.S. ----, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994); *E.E.O.C. v. Ohio Edison Co.,* 7 F.3d 541 (6th Cir.1993); *Passer v. American Chemical Society,* 935 F.2d 322 (D.C.Cir.1991); *E.E.O.C. v. J.M. Huber Corp.,* 927 F.2d 1322 (5th Cir.1991) (assuming that former employee can sue under Title VII retaliation provision when employer allegedly retaliates by refusing to pay post-employment profit-sharing benefits); *Patchenko v. C.B. Dolge Company, Inc.,* 581 F.2d 1052 (2nd Cir.1978); *Rutherford v. American Bank of Commerce,* 565 F.2d 1162 (10th Cir.1977); *but see Robinson v. Shell Oil Co.,* 70 F.3d 325 (4th Cir.1995), *cert. granted,* --- U.S. ----, 116 S.Ct. 1541, 134 L.Ed.2d 645 (1996). We also noted in *Bailey* that the same rationale had been employed in the age discrimination context to extend protection to former employees. *Bailey,* 850 F.2d at 1509 (citing with approval *E.E.O.C. v. Cosmair, Inc., L'Oreal Hair Care Div.,* 821 F.2d 1085, 1088 (5th Cir.1987) ("The term "employee' ... is interpreted broadly:  it includes a former

employee as long as the alleged discrimination is related to or arises out of the employment relationship.")).  Following this overwhelming case law, we held that "a strict and narrow interpretation of the word "employee' to exclude former employees would undercut the obvious remedial purposes of Title VII." *Bailey,* 850 F.2d at 1509.

It is significant that Congress enacted the ADA in 1990. Congress is deemed to legislate against the background of the federal common law. *Astoria Fed. S & L Ass'n v. Solemino,* 501 U.S. 104, 108, 111 S.Ct. 2166, 2169-70, 115 L.Ed.2d 96 (1991).  When Congress enacted the ADA in 1990, it was clearly established Title VII case law that the term "employee" includes former employees. Congress is deemed to be familiar with such case law.  In the ADA, Congress used the same definition of "employee" that it used in Title VII.  The text of the ADA expressly refers to Title VII, and the legislative history clearly indicates a Congressional intention to incorporate the established Title VII meaning for the term "employee."

The majority purports to "easily distinguish" *Bailey* and the other retaliation cases.  However, the only rationale offered for the distinction, beyond the majority's *ipse dixit* that retaliation cases are different, is that a broad interpretation of the term "employee" was "necessary to provide meaning to anti-retaliation provisions and effectuate congressional intent."  At 2977.  It is not at all apparent what difference there is between Title VII anti-retaliation claims and claims by former employees for discrimination with respect to fringe benefits.  The

anti-retaliation provision would have ample scope without claims by former employees. For example, current employees often sue for retaliation when subjected to discrimination because of having filed an EEOC complaint. It is no more necessary with respect to Title VII retaliation than it is here to include former employees in order to "provide meaning" to the statute. Indeed, the denial of claims of former employees with respect to fringe benefits would seem to intrude more severely on the obvious congressional intent to protect employer-provided fringe benefits. As a matter of common experience, fringe benefits are designed and provided primarily for the post-employment years. I respectfully submit that the majority's attempted distinction of *Bailey* and the retaliation cases is flawed. *Bailey* is binding precedent, and its rationale should govern this case.[5]

The text of the statute also expressly refers to the Rehabilitation Act of 1973. 42 U.S.C. § 12201(a) ("[N]othing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973."). The majority acknowledges that Congress intended the courts to interpret the ADA with reference to the Rehabilitation Act. M/S at 15 (citing H.R.Rep. No. 485(II), 101st Cong., 2d Sess. 23 (1990)). Section 504 of the Rehabilitation Act prohibits

---

[5]Other non-retaliation Title VII cases have also extended protection to former employees. *See E.E.O.C. v. South Dakota Wheat Growers Ass'n,* 683 F.Supp. 1302 (D.S.D.1988) (rejecting the argument that Title VII does not cover post-employment health benefits); *see also Long v. State of Florida,* 805 F.2d 1542 (11th Cir.1986), *rev'd on other grounds,* 487 U.S. 223, 108 S.Ct. 2354, 101 L.Ed.2d 206 (1988) (assuming that former employees have standing under Title VII to challenge discriminatory practices with regard to payments from employee pension plan).

discrimination against an "otherwise qualified handicapped individual" in any federally funded program. 29 U.S.C. § 794. Analysis of the cases construing this phrase provides insight into logic behind Congress' use of the nearly identical "qualified individual with a disability."

The Supreme Court has held that "[a]n otherwise qualified person [under § 504] is one who is able to meet all of a program's requirements in spite of his handicap." *Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979). The Court captured the essence of this concept when it wrote:

> Section 504 by its terms does not compel educational institutions to disregard the disabilities of handicapped individuals or to make substantial modifications in their programs to allow disabled persons to participate. Instead, it requires only that an "otherwise qualified handicapped individual" not be excluded from participation in a federally funded program "solely by reason of his handicap," *indicating only that mere possession of a handicap is not a permissible ground for assuming an inability to function in a particular context.*

*Id.* at 405, 99 S.Ct. at 2366 (emphasis added).

The court in *Modderno v. King,* 871 F.Supp. 40 (D.D.C.1994), *aff'd,* 82 F.3d 1059 (D.C.Cir.1996), addressed a Rehabilitation Act claim of discrimination in the provision of health insurance fringe benefits. The plaintiff, Modderno, was the former spouse of a Foreign Service officer, and qualified for Foreign Service Benefit Plan health insurance on that basis. During the period that she was covered by the Plan, the Plan imposed a lower limit on mental health benefits,[6] as compared to the limit on benefits for physical

_____

[6]The Plan was changed to include a $75,000 lifetime maximum for mental health benefits.

ailments.  *Modderno,* 82 F.3d at 1060.  Although the court did not find that this limit amounted to discrimination in violation of § 504, it nonetheless implicitly recognized that a plan participant could assert a claim of discrimination in the provision of fringe benefits.  The *Modderno* district court wrote that,

> To establish a prima facie case under § 504, a person must be handicapped under the Act, *otherwise qualified to receive or participate in the federally supported benefit or program,* and be excluded from the benefit solely by reason of her or his handicap.

*Modderno,* 871 F.Supp. at 42 (citing *Pesterfield v. Tennessee Valley Authority,* 941 F.2d 437, 441 (6th Cir.1991) (emphasis added)).[7]

Finally, my position that retirees and other former employees are protected under the ADA is supported by a common sense reading of the statute.  As noted above, § 12111(8) provides that a "qualified individual with a disability" means "an individual with a disability who ... can perform the essential functions of the employment position...."  A retired or former employee, like Bourgeois, has already performed all of the functions expected of him with respect to the job he occupied before retirement.  Under the company's plan, the only additional "functions" expected of Bourgeois, and other retired or former employees, are to make the

---

[7]The Eighth Circuit, in *Beauford v. Father Flanagan's Boys' Home,* 831 F.2d 768 (8th Cir.1987), employed a rationale very similar to that of the majority in this case.  The opinion makes no reference to the overwhelming Title VII case law discussed above.  I respectfully submit that *Beauford,* like the majority opinion in this case, ignored not only that overwhelming case law, which constitutes the background against which Congress legislated, but also ignored the obvious common sense construction of the statute in light of its purpose and legislative history.  *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 241, 109 S.Ct. 1775, 1786, 104 L.Ed.2d 268 (1989) ("We need not leave our common sense at the doorstep when we interpret a statute.").

appropriate election, pay the premiums, etc. Fringe benefits, such as the one at issue here, are all part of the overall compensation package provided for employees as consideration for their service during their active years with the company. Post-employment benefits are like deferred compensation, and are expected to be enjoyed during the post-employment years. The common sense of the concept, "qualified individual with a disability," is that there should be no discrimination because of stereotypes or stigmas. Differences in treatment are legitimate when based on the ability of a person to perform the functions expected in the position. In other words, the protections of the Act accrue to disabled persons who can perform the functions expected to be performed by persons without disability in the same position. As the Supreme Court put it in *Southeastern Community College v. Davis:* "Mere possession of a handicap is not a permissible ground for assuming an inability to function *in a particular context.*" 442 U.S. at 405, 99 S.Ct. at 2366 (emphasis added). Applying that common sense in the instant context, it is obvious that retirees and other former employees, who because of their prior employment are entitled to participate in post-employment fringe benefit plans, are not expected to perform the functions of the jobs they previously held before retirement. Rather, they are expected to meet whatever criteria are mandated by the fringe benefit plan for the accrual and continuation of coverage, including, for example, any required minimum years of employment, honorable discharge, and the payment of premiums.

In summary, I respectfully submit that the majority sees

"plain meaning" when there is none.  The majority ignores the common sense reading of the statute and the evident congressional purpose as revealed in the structure of the statute, its legislative history, and the overwhelming case law which provided the background against which Congress legislated.[8]  Because I cannot agree with the majority's conclusions, I respectfully dissent.

---

[8]I have found very few ADA cases squarely addressing the issue before us.  A district court in the Northern District of Illinois rejected as unpersuasive and without case law support an argument that the employment provisions of the ADA do not apply to former employees. *Northen v. City of Chicago,* 841 F.Supp. 234, 236 (N.D.Ill.1993).  However, *Parker v. Metropolitan Life, Ins. Co.,* 875 F.Supp. 1321 (W.D.Tenn.1995), *appeal docketed,* No. 95-5269 (6th Cir.1995), followed *Beauford v. Father Flanagan's Boys' Home,* 831 F.2d 768 (8th Cir.1987), and held that a former employee was not a qualified individual with a disability, and thus could not make an ADA claim under the employer's disability plan.  The *Parker* court based this holding on its conclusion that the employee had become totally disabled and was no longer able to perform the essential functions of the job she had previously held.  In my judgment, *Parker,* like *Beauford,* is flawed.  It failed to address the overwhelming Title VII case law which provided the background against which Congress enacted the ADA, and failed to address the common sense construction of the Act in light of its purpose and legislative history.